```
H3dnshac
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

      v.                                    17 Mag. 1753 (DLC)

DAVID SHALAM,

          Defendant.              Bail Appeal

------------------------------x

                                        New York, New York
                                        March 13, 2017
                                        10:00 a.m.

Before:

                     HON. DENISE COTE,

                            District Judge

                      APPEARANCES

JOON KIM
    Acting United States Attorney for the
    Southern District of New York
BY:  ALISON G. MOE
    Assistant United States Attorney

JOSEPH A. BONDY
    Attorney for Defendant

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1           (Case called)
2           MS. MOE:  Yes, your Honor.  Good morning.  Alison Moe,
3  for the government.  I am joined at counsel table by Special
4  Agent Leslie Adamczyk from the FBI and forensic examiner
5  Porsche Brown, also from the FBI, and John Moscato from
6  pretrial services.
7           MR. BONDY:  Good morning, your Honor, Joseph A. Bondy
8  on behalf of David Shalam.  How are you?
9           THE COURT:  Good morning, everyone.
10          This is an appeal from a bail decision made by the
11 magistrate judge.  It's the government's appeal.  I have read
12 the pretrial services officer's report.  I don't see a date on
13 it, but it's a -- oh, yes, the last page, March 10 report, and
14 I have read the complaint filed on March 9.
15          I will hear from the government.
16          MS. MOE:  Thank you, your Honor.
17          Your Honor, this is not a close case at all.  The
18 defendant clearly poses both an extreme danger to the community
19 and a significant flight risk.  There are no conditions that
20 would assure of the safety of the community and the defendant's
21 appearance in court.
22          Before addressing the bail factors, it bears
23 emphasizing at outset, your Honor, that today's appeal is all
24 that stands between this defendant, who is charged with paying
25 a woman to rape her children so he could watch over Skype, and

1  that same defendant going home today to his house, where minor
2  children are present and there are computers and other Internet
3  capable devices.  That's what Judge Ellis' order permits.
4         Turning first to the issue of danger, the offense
5  conduct illustrates that the defendant poses a clear danger to
6  minors.  Again, he's charged with paying a woman to molest her
7  own children in live child pornography shows.  Those children
8  were six and eight at the time of the offense, and the
9  defendant took an active role in their abuse, directing the
10 woman who is identified in the complaint as Jane Doe as to what
11 sexual acts he wanted her to perform and which children he
12 wanted her to perform them with.
13        The acts that are included in the complaint are just a
14 small sample of the conversations that occurred.  In one
15 instance the defendant told Jane Doe to digitally penetrate her
16 own six-year-old daughter.  In another conversation he
17 instructed Jane Doe to engage in oral sex with her
18 eight-year-old son, and in yet another conversation the
19 defendant told Jane Doe that he wanted that same six-year-old
20 girl to watch him ejaculate on video.  This offense conduct
21 occurred over a lengthy time period, from April 2015 to January
22 2016.  Significantly, the conduct only stopped because Jane Doe
23 closed her account when she learned that she was likely to be
24 arrested.
25        After Jane Doe closed her account, the defendant still

1   continued to use that same Skype account that he used to commit
2   these other offenses.  We know this from IP logs that reflect
3   that the defendant continued to use that account.  This account
4   was registered under a pseudonym and all indications point that
5   this was in effect the defendant's secret child pornography
6   account.  Most recently, last week, the defendant was caught in
7   possession of child pornography.
8            So, in sum, all of the evidence demonstrates that the
9   defendant's desire to view images of sexually abused children
10  has not diminishes.  There can be no question that this
11  defendant poses a significant danger to minors.
12           Turning to the question of flight risk, your Honor,
13  count one carries a mandatory minimum sentence of 15 years'
14  imprisonment if the defendant is found guilty.  Faced with the
15  prospect of such a steep penalty, the defendant has a strong
16  incentive to flee.  On that point the government submits that
17  the evidence outlined in the complaint has put the defendant on
18  notice that the evidence against him is very strong.
19           The defendant is a man of considerable means, as the
20  pretrial services report outlines, and so he has every reason
21  to flee and every means to do so.
22           Finally, as the Court is aware, a defendant can easily
23  cut off an ankle bracelet and flee.
24           Given the danger that this defendant poses to the
25  community and the significant flight risk he poses, there are

1  no conditions that would adequately address these risks.

2     The defendant if bailed would go home to a house
3  filled with computers, smart phones and other Internet-capable
4  devices.  That presents an unacceptable risk that this
5  defendant will harm minors.

6     On this point, your Honor, I would direct the Court's
7  attention to an opinion from the Eastern District of New York
8  issued in 2014.  In that case, the case is United States v.
9  Valerio, at 9 F.Supp.3d 283.  It is a 2014 opinion from the
10 Eastern District of New York authored by Judge Bianco.

11    In that case the defendant was charged with a very
12 similar offense and sought bail and Judge Bianco, I'm reading
13 from page 294 of the reporter, observed, "As part of his bail
14 package, the defendant agrees to not possess, much less use or
15 access a computer or other Internet-capable device and agrees
16 to unannounced searches of the house and all persons therein.
17 Under the circumstances of this case, however, the Court finds
18 these conditions are difficult, if not impossible, to enforce
19 and are otherwise insufficient to assure the safety of the
20 community.  Even with the presence of a guard inside the home
21 at all times and the taking of steps to prevent electronic
22 devices from being in the house, there's no way to ensure the
23 full monitoring of the defendant's activities.  Computers,
24 mobile phones, tablets, etc., the types of instrumentalities
25 allegedly used to commit the crimes are ubiquitous and easy to

1  procure or hide, and increasingly even the lowest level devices
2  have Internet functionality.  Unlike in a jail, which provides
3  greater layers of security to attempt to insure that inmates do
4  not possess contraband the Court can conceive of several
5  avenues through which the defendant may procure or retain such
6  devices on the premises, which heightens the risk of danger to
7  the community."
8         In this case, your Honor, Judge Ellis's order permits
9  the defendant to reside in a home with computers subject to
10 computer monitoring, in other words, the conditions that were
11 set were lower than the worst-case scenario that Judge Bianco
12 was envisioning when he denied bail in a very similar case.
13        My understanding of the pretrial services computer
14 monitoring program is that it does not involve realtime
15 monitoring of computer activity.  Instead, pretrial services
16 will just get a weekly summary of the defendant's activity on
17 all of the computers in the home.
18        Pretrial services cannot monitor any phones used in
19 the home, which is problematic, given that Skype and many other
20 apps used to commit offenses like this can be used on a smart
21 phone, and pretrial services also cannot monitor any tablet,
22 which poses similar risks.
23        This presents several problems.
24        First, the defendant could harm minors for an entire
25 week without pretrial knowing.

1    And, second, when pretrial reviews web traffic, it
2    will be impossible to tell which family members within the home
3    are accessing which websites, and it will be impossible for
4    pretrial to differentiate between activity that may seem
5    innocent.  For example, pretrial services may see logs again a
6    week later that reflect a member of the household has used an
7    Internet platform for video or chat communication, but there
8    can be no way of knowing if that is one of the defendant's
9    children using something like FaceTime or Skype in an innocent
10   manner or whether it is the defendant harming minors.
11            A representative from pretrial services, John Moscato,
12   is here today and is prepared to address any questions the
13   Court might have about electronic monitoring.
14            Unless the Court has any questions, I just want to
15   conclude by emphasizing that this is a presumption case by
16   statute.  In establishing a mandatory minimum and a presumption
17   of detention, Congress intended for this exact type of conduct
18   to be treated by the Court as serious.
19            This defendant is actually the type of defendant these
20   laws have in mind.  If there were ever a defendant who were
21   suitable for detention and where detention were required, it
22   would be this defendant.
23            Thank you, your Honor.
24            THE COURT:  Mr. Bondy.
25            MR. BONDY:  Thank you, your Honor.  Your Honor, when

1    we appeared in front of Judge Ellis, we had a pretrial services
2    report that called for a bond to be cosigned by two financially
3    responsible people.  Judge Ellis amplified that more than
4    double.
5            We had ultimately four suretors vetted by the U.S.
6    Attorney's office and Mr. Shalam's wife, a fifth suretor for
7    moral suasion purposes.  All signed on to a half a million
8    dollar bond, a significant bond with respect to this family.
9            There are factors to be considered today, and I note
10   that in arriving at a combination of factors, to the extent the
11   Court can, it's really the least restrictive set of factors.
12           We have offered up electronic monitoring, home
13   detention.  He will not have any smart phone, computer device
14   of any sort.  I am listening to the government talk about the
15   children that do live in the home, two of whom are adults and
16   three of whom are minors, and their tablet and their phone
17   issues.  I would like to think there's some means to address
18   that through court order or otherwise.
19           THE COURT:  Such as?
20           MR. BONDY:  Well, I have two things I will propose.
21   Because it's least restrictive, I'll throw it out there.  Since
22   the time of Judge Ellis's determination, I have reached out to
23   the government and tried to negotiate a consent package with
24   them.  We have five suretors, your Honor.  I would amplify the
25   number of suretors.  We can amplify the amount of the bond.  We

1    can amplify the amount that the bond is secured by.  We could
2    have a group of third-party monitors, as I think the Bail
3    Reform Act allows.
4         THE COURT:  What do you mean?  Third-party monitors
5    for what purpose?
6         MR. BONDY:  Who, quote, agree to assume supervision
7    and to report any violation of the release condition to the
8    Court subject to 18 U.S. Code Section 3162 Section
9    (c)(1)(B)(i).
10        So I have Mr. Shalam's rabbi in the court.  He's part
11   of a religious community.  He has over 15 family members in the
12   Court who are all aware of the nature of the allegations
13   against him.  All of them would be willing to serve in some
14   capacity to either check in with him every day, report
15   violations to the Court.  He would submit to daily pretrial
16   visits if that was what was necessary.
17        And, as a final resort, if the Court can't get over
18   the problem of children in the home and their tablets,
19   Mr. Shalam's father is here today.  He's 87 years old.
20   Mr. Shalam would live with him.  He doesn't have electronic
21   devices in his home.  Indeed, he has a medical issue that
22   Mr. Shalam is already assisting him with and is a caregiver
23   for.
24        So if the issue comes down to we cannot secure that
25   home in a way that satisfies the Court that Mr. Shalam is not

|   |   |
|---|---|
| 1 | going to be engaging in the type of conduct alleged in Count |
| 2 | One we could move to another home. |
| 3 | I would also note and this was a big deal at last |
| 4 | week's proceeding, that the woman Mr. Shalam is alleged to have |
| 5 | been involved with was apparently arrested in Romania and |
| 6 | charged with multiple counts of similar nature, pulled the plug |
| 7 | on the Skype account. |
| 8 | I had invited the government last week and invited |
| 9 | them again, since they had argued he was a predator who needed |
| 10 | to be locked up and was the quintessential predator, to |
| 11 | identify any evidence of him subsequent to this count being |
| 12 | closed engaging in any of the type of conduct alleged in Count |
| 13 | One, which of course triggers a presumption. |
| 14 | Magistrate Ellis thought that was material, because it |
| 15 | evidenced some ability of this man to control himself and not |
| 16 | to just be out of control so to speak. |
| 17 | So I don't think there's any other evidence since |
| 18 | January of 2016 to show a continuing series of violations of |
| 19 | that type of behavior, the directing of or the promoting or the |
| 20 | enticing or the inducing of a child's pornographic performance. |
| 21 | Obviously, we have a presumption of innocence here, |
| 22 | and nothing I'm saying I intend to have undermine that.  But it |
| 23 | seems to me that in this case, if we were to have a number of |
| 24 | suretors, a bigger bond, a monitoring team in place in the |
| 25 | home, a curfew -- obviously he's under home detention and any |

1     other kinds of devices pretrial services last week had
2     indicated to Judge Ellis that they could place on a telephone
3     to determine what's being visited or on a computer to determine
4     what's being viewed, all of those would be consented to.
5     There's not one of these conditions that we wouldn't consent
6     to.
7              However, I believe that, in looking at the man
8     himself, for 50 years he has never had any contact with the
9     criminal justice system.  Obviously he's not on parole or any
10    other type of supervised release during the commission of this
11    offense.
12             The offense is morally repugnant, morally repugnant
13    and occurs over a nine-month period as alleged by the
14    government.  I had suggested to the magistrate that it's easy
15    on place a multiplier on that because of the repugnancy of the
16    charge and to say this is the nature of the person and that he
17    is a bad human being.  But that is not his nature and that's
18    not his true self, and the way that he gets here is the way
19    many defendants get into this courtroom.  There have been
20    people who have appeared even in front of your Honor with
21    substantial mandatory minimum sentences they were facing in
22    cases involving minors who the government agreed to bail on and
23    then who ultimately were sentenced to relatively low periods of
24    incarceration.
25             So I understand the presumption starting out.  I

1   understand, as this man does, the mandatory minimum in effect.
2   I understand the mandatory minimum in effect as to Count Two
3   because there is a five-year mandatory minimum.
4          Nonetheless, there is a combination of conditions I
5   believe, your Honor, that could satisfy the safety of the
6   community.
7          I have his travel document. I've always offered the
8   travel document, the passport. I have it with me. That was
9   not the emphasis of our argument in front of the magistrate.
10  What was the emphasis clearly was this danger to the community.
11         I am not sure if the Court has any questions for me.
12  If the Court would like to hear from Mr. Shalam's rabbi, who
13  has come in from Brooklyn, and would speak to him being able to
14  be supervised as well within that community and for that
15  community participating in the system as well.
16         I think that somewhere along what I have lain out
17  there is a set of conditions. I ask the Court to find the
18  least restrictive set of conditions so that Mr. Shalam can be
19  home and try to start to repair the family relationships, as
20  you can imagine and appreciate, and at the same time be able to
21  defend himself from outside of the MDC.
22         Thank you.
23         THE COURT: Thank you.
24         The structure of addressing this bail application is
25  set forth in a Second Circuit decision United States v.

1   Mercedes, 254 F.3d 433.  As a presumption case, the defendant
2   bears a limited burden of production.  I find he's met that
3   with the proffer of the sureties and the other arguments he's
4   presented today.
5           With that, the burden shifts to the government to
6   convince me that detention is the only appropriate alternative
7   here.  The presumption, however, remains a factor to be
8   considered in the analysis.
9           The government has the ultimate burden of persuasion
10  by clear and convincing evidence when it comes to whether or
11  not the defendant presents a danger to the community.  The
12  government has the burden of persuasion by a preponderance of
13  the evidence when the issue is a risk of flight.
14          The parties have principally focused on danger to the
15  community, though the government argues under both prongs.  In
16  terms of flight, there is the mandatory minimum term of
17  imprisonment, the means to flee, the history of international
18  travel, perhaps to some countries from which there is no
19  extradition.
20          But let me principally focus on the danger to the
21  community.  I have to consider the factors set forth in Section
22  3142(g), so let me begin with that.
23          The nature and circumstances of the crime charged,
24  obviously an extraordinarily serious offense committed over the
25  Internet across international lines, but able to be committed

1    over the Internet in this country as well, a crime that
2    Congress views with significant seriousness, given the nature
3    of the punishment imposed, and that includes the presumption of
4    the mandatory minimum that will apply here.
5             The second factor is the weight of the evidence
6    against the defendant.  It appears extremely strong from the
7    complaint, including a postarrest statement, seizures of
8    materials and document reflecting the Internet traffic, and it
9    is not argued to me that it is not significant.
10            The third is the history and characteristics of the
11   defendant, including family ties, employment, community ties
12   and past conduct.
13            The defendant has no criminal record.  He has family
14   ties and community ties.  He had employment, though he
15   conducted crime in part from his home and in part when he was
16   traveling and in part from his workspace, and the bail package
17   is a concession that he cannot leave his home again.
18            The fourth factor is the nature and seriousness of the
19   danger to the community or to an individual.
20            Obviously the danger is extraordinary.  It involves
21   innocent children who are unable to defend themselves or
22   protect themselves.  This is an issue of de novo review by this
23   Court.
24            I appreciate that Judge Ellis put together a package
25   that he considered appropriate.  I appreciate that pretrial

1    services considered a package that they deemed appropriate.
2    But as our conversation today indicates, what you really need
3    is someone to monitor the defendant 24/7 to ensure that he has
4    no access to the Internet.
5           That can't happen in the family home.  No one is able
6    to do that in the family home.  The family home will have
7    Internet devices.  There's no daily or weekly check-in that can
8    assure that the defendant doesn't have access to those devices
9    in the family home.
10          I hear today -- I don't know that this was presented
11   to Magistrate Judge Ellis, that the defendant would move to his
12   father's home that doesn't have an Internet capacity.  But,
13   again, in this day of smart phones you don't need an Internet
14   plan as the only way to ensure an Internet plan with a computer
15   in the home.  The only way to ensure that the defendant has no
16   Internet access and is not able to victimize other children in
17   this way is the restriction argued by the government, which is
18   detention.
19          For all those reasons, I order the defendant to be
20   detained.
21          MR. BONDY:  I hear you, your Honor.  But may I ask for
22   say ten suretors secured by a million dollars worth of
23   property.
24          THE COURT:  No.  You may ask, but that is isn't going
25   to change the ruling, and I have ruled.

```
 1            MR. BONDY:  No guard in the home?  There will be
 2    nothing, your Honor.
 3            THE COURT:  I gave you a full opportunity to argue,
 4    Mr. Bondy.  We are not going to have reargument.
 5            MR. BONDY:  I understand.  Thank you.
 6            THE COURT:  Thank you.
 7            (Adjourned)
```